**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| **v.** | * | **Case No. 1:20-cr-00162-SAG** |
| **SANDRA KING,** | * | |
| **Defendant.** | * | |

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM**

The United States of America, by its undersigned counsel, submits this Sentencing Memorandum for the sentencing of Sandra King, currently scheduled for October 19, 2020.

**I.      INTRODUCTION**

From 2014 to 2019, Defendant Sandra King ("King") was the president of two unions, the Federation of Police and Security ("FOPS") and the Alliance of Independent Workers ("AIW"). FOPS represented private security guards at multiple locations in the D.C. area, including at the Uniformed Services University of Health Sciences ("USUHS") in Bethesda, Maryland, the Consumer Financial Protection Bureau in Washington, D.C., and the National Science Foundation in Northern Virginia.  AIW represented the communication staff, mortuary staff, medical records staff, and the child fatality staff at the District of Columbia, Office of the Chief Medical Examiner ("OCME").

King stole more than $50,000 from these unions during her tenure as president.  King used the union bank accounts as her own personal bank accounts, spending money a variety of personal purchases, from putting gas in her car to purchases at Wal-Mart and Target.  She not only committed this crime after watching her predecessor go to prison for the same conduct, she also continued to steal from the unions after she was confronted by federal investigators in June 2019. At the same time that she was spending union dues on her personal expenses, she was not providing

1

any meaningful leadership to the unions.  For these reasons and for the reasons discussed below, the United States is recommending the following sentence:  (1) a one-year term of imprisonment; (2) three years of supervised release; and (3) restitution of $57,328.01 that is due in full immediately and pursuant to a schedule that is consistent with King's finances.

II.    **FACTS**

    **A.  King witnessed her predecessor go to prison for theft, and the Department of Labor advised her that personal use of union funds was a prohibited.**

In June 2014, the United States charged J.C. Stamps, the president of the National Union of Police and Security ("NUPSA"), with theft from the NUPSA employee benefit plan.  *See* Information, *United States v. Stamps*, Case No. 1:14-cr-00123-RDM (D.D.C.), attached as **Exhibit A**.  NUPSA later changed its name to FOPS.  King provided administrative support to Stamps when he was president of NUPSA, and she succeeded him as the president of both NUPSA/FOPS and AIW.  Stamps pleaded guilty, and on October 1, 2014, the Court sentenced him to a nine-month term of imprisonment.  *See* Stamps Oct. 1, 2014 Judgment, attached as **Exhibit B**.

Two days after Stamps' sentencing, investigators from the United States Department of Labor, Office of Labor-Management Standards ("OLMS") met with King and informed her of her fiduciary obligations as the president of the FOPS.  OLMS also instructed King that union funds were to be used only for the benefit of the union members, and that personal use of the union funds was a violation of federal law.  By the end of the month, King had already stolen more than $3,000.00 from FOPS.  *See* Oct. 2014 Personal Expenditures, attached as **Exhibit C**.

    **B.  King did not provide any meaningful leadership to her unions.**

As president of FOPS and AIW, King should have assisted her members by bargaining with employers, litigating grievances, and providing administrative support to the unions.  The union members, however, reported that King provided no leadership, at all.  According to M.N.,

2

who was the shop steward (the lead union representative in a bargaining unit) for the FOPS members at USUHS, "King never did one thing for us."   *See* Dec. 12, 2018 Report of Interview of N.M., attached as **Exhibit D**.  King never held membership meetings and never visited the USUHS worksite.  *Id.* at 1-2.  M.N. wanted to file a grievance with her employer because her employer suspended her for missing work even though she was sick and had a note from her doctor.  *Id.* at 2.  King did not provide M.N. with any assistance with the grievance, and M.N. ultimately never filed the grievance.  *Id.*  King told M.N. that she had a regular job and that the FOPS members at USUHS were not her only priority.  *Id.*

On another occasion, N.M. told King that new security guards were considering joining FOPS and wanted more information.  *Id.*  King refused to visit the worksite and meet with the potential members and instead offered N.M. $3.00 for every new member that she got to join the union.  *Id.*  After that incident, N.M. decided to quit the union.  *Id.*  N.M. concluded her interview with federal investigators by stating "It is not a good feeling when you are struggling to take care of your kid and pay the bills the right way and see someone spending your dues money to live the highlife."  *Id.* at 6.

The shop steward for AIW, P.G., similarly reported that King "never did any work for the union."  *See* Jan. 27, 2020 Report of Interview of P.G. at 3, attached as **Exhibit E**.  According to P.G., King never held membership meetings and only came to the OCME worksite once to introduce herself.  *Id.* at 2.  P.G. stated that when one employee had an issue with his employer, P.G. had difficulty getting in touch King, and the employee eventually had to hire a private attorney for assistance because "[King] did nothing."  *Id.* at 3.  P.G. and the other members of AIW eventually had to look for new representation.  *Id.* at 4.

**C.  King stole from FOPS and AIW for five years, and she continued her theft even after she was caught.**

As president of FOPS and AIW, King was not only in a position of trust as the leader of these unions, but she was also a fiduciary of the unions as she was the only authorized signatory on the FOPS and AIW bank accounts.  FOPS maintained accounts at SunTrust and Wells Fargo, and AIW maintained an account at Wells Fargo.  King deposited dues from union members and restitution payments from Stamps into these bank accounts.

King used the union bank accounts as her own personal spending accounts.  King used union funds for her personal benefit by writing checks to cash, making cash withdrawals at automated teller machines, and making personal purchases using the unions' debit cards.  She used union funds to purchase liquor, pay rent on her apartment, and purchase items at Target, Wal-Mart, Amazon, Apple iTunes, and at grocery stores.  She also used these funds to pay for her personal life insurance and automobile insurance.  Additionally, King's personal expenditures often caused overdrafts on FOPS's bank account, which caused FOPS to incur an additional loss of $6,388.50 in overdraft fees and penalties.

On June 12, 2019, federal agents with OLMS interviewed King, and she admitted to some of the personal expenditures.  Yet, after that meeting, King went on to steal nearly $5,000.00.  *See* Post-June 12, 2019 Expenditure Analysis, attached as **Exhibit F**.

### III.     RESTITUTION

**A.  The Victims and the Amount**

Prior to entering the Plea Agreement, the Government provided a detailed spreadsheet to King's counsel that detailed the loss calculation.  In the Plea Agreement, the parties agreed that the loss was at least $57,328.01, which was comprised of a $20,368.76 loss from FOPS, a $30,570.75 loss from AIW, ands an additional $6,388.50 in overdraft fees on the FOPS account.

4

FOPS and AIW are no longer operating, and the bargaining units that they represented are now represented by new unions, which the Government has identified below.  Additionally, King and FOPS pledged Stamps' restitution payments to the National Labor Relations Board ("NLRB") as part of a settlement that arose from Stamps' failure to process grievances during his tenure as president of NUPSA.[1]  *See* Formal Settlement Stipulation, Case No. 06-CB-105424, NLRB, Region 6, attached as **Exhibit G**.  The chart below summarizes the amounts owed to the successor unions and the NLRB.

### Sandra King - Restitution Schedule

**Total Loss from Federal of Police and Security:  $26,757.26**

| To be paid to: | Organization | Amount |
|---|---|---|
| | National Labor Relations Board | $3,467.00 |
| | International Union, Security, Police and Fire Professionals of America | $11,645.13 |
| | Governed United Security Professionals | $11,645.13 |

**Total Loss from the Alliance of Independent Workers:  $30,570.75**

| To be paid to: | Organization | Amount |
|---|---|---|
| | National Association of Government Employees | $30,570.75 |

**Total Restitution:**                                                                          **$57,328.01**

A detailed worksheet that includes addresses and payee information is attached as **Exhibit H**.

---

[1] Part of the Settlement Agreement with NLRB required the FOPS to "cease and desist from . . . [p]ermitting any further alienation of its assets by its current Executive Director, Sandra M. King." **Ex. G** at 4.

### B.  The Order

Pursuant to the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, and pursuant to the Plea Agreement, the Court must order restitution in the full amount of the victims' losses.[2]  The Court should order that the restitution be due "in full immediately" and pursuant to a payment schedule that is consistent with King's finances.

As to the "in fully immediately" order, Congress has expressed a preference through statute that restitution be payable immediately.  *See* 18 U.S.C. § 3572(d)(1).  This statutory preference is consistent with the Crime Victims' Rights Act mandate that victims receive "full and *timely* restitution as provided in law."  18 U.S.C. § 3771(a)(6) (emphasis added).  Restitution orders that are payable in full immediately allow the government to use its full array of tools to ensure that victims receive restitution in a timely manner.  Even where a defendant does not have the ability to pay the full amount of the debt immediately, the "in full immediately" order allows the government to act swiftly in the event that the defendant's finances change.  Further, an "in full immediately" order does not prejudice a destitute defendant because if the defendant has no assets, then the Government cannot take any action to collect the debt.  Moreover, oppressive collection tactics are prohibited by the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.*, and the Consumer Credit Protection Act, 15 U.S.C. § 1601 *et seq.*  Lastly, the "in full immediately"

---

[2] The count of conviction, 29 U.S.C. 501(c), does not fall within § 3663A(c)(1) of the MVRA. The parties, however, agreed in Section 3.c of the Plea Agreement that conduct covered by the MVRA gave rise to the Plea Agreement, which is sufficient to trigger the MVRA under § 3663A(c)(2).

order allows the Bureau of Prisons to collect restitution through the Inmate Financial Responsibility Program ("IFRP").[3]

Pursuant to 18 U.S.C. § 3664(f)(2), the Court is also required to order a payment schedule consistent with the Defendant's finances.  King's Pre-Sentence Report shows excess monthly income of $824.00.  The Court should set a payment schedule of at least $500.00 per month.

## IV.    RESPONSE TO KING'S SENTENCING RECOMMENDATION

King's counsel filed a letter with the Court along with letters from family members requesting that the Court not sentence King to a term of imprisonment.  Although King has certainly encountered tragedy and trauma in her life, the filings indicate that King comes from a loving family and that King herself is professionally resourceful.  She has been working since she was 13 years old.  She did not need to steal money in order to provide for herself.

King attributes her theft to financial difficulties that she encountered as part of her divorce. The facts, however, indicate that her theft was more about opportunity than it was about any financial difficulties.  King assumed control of FOPS in October 2014.  Her first personal withdrawal of union funds came on October 6, 2014.  *See* **Ex. C**.  Additionally, her theft did not end when she found new employment after her divorce.  King started working for two different home healthcare companies in January 2015, only three months after she assumed control of the

---

[3] BOP is likewise prohibited from using oppressive collection tactics.  The IFRP is a voluntary program that is intended to "encourage[] each sentenced inmate to meet his or her legitimate financial obligations," and that "the inmate's efforts to fulfill those obligations [are] indicative of that individual's acceptance and demonstrated level of responsibility." 28 C.F.R. § 545.10.  BOP works with each inmate and uses an ability-to-pay approach to establish a defendant's IFRP payment.  *Id.* § 545.11.  Moreover, BOP cannot use IFRP to deprive inmates of essential items. In addition to the Eighth Amendment's prohibition on cruel and unusual punishment, BOP's regulations mandate that every inmate be provided with certain necessities, such as over-the-counter medication, paper and envelopes, stamps for legal and community correspondence, and personal hygiene items.  *See* 28 C.F.R. §§ 549.30, 540.21, 551.6.

unions.  In fact, King frequently told union members that they were not her only priority because she had a full time job.  *See*, *e.g.*, **Ex. D** at 2; **Ex. E** at 3.  King did not steal from the unions because she needed to, she stole from the unions because she could.

Finally, King argues that the Court should not sentence her to a term of imprisonment because of the coronavirus.  In doing so, King is blending a sentencing determination with a designation determination.  King presumes without justification that BOP cannot safely house her. The BOP has ably managed its prison population during the pandemic and can do so for King.

## V.    SENTENCING RECOMMENDATION

The Government's one-year sentence recommendation is within the United States Sentencing Guidelines and is otherwise consistent with the factors in 18 U.S.C. § 3553(a).  As for the Sentencing Guidelines, the parties and U.S. Probation agree that King's offense level is 12, which provides for an imprisonment range of 10 months to 16 months.

As for the remaining § 3553(a) factors, the discussion above elucidates many of those factors, but the Government would like to emphasize one factor in particular:  deterrence.  The Court's sentence should "afford adequate deterrence to criminal conduct."   18 U.S.C. § 3553(a)(2)(B).  This factor also would have been applicable to Stamps' 9-month sentence.  But we know from King's conduct that Stamps' 9-month sentence was not a deterrent.  King also was not deterred when, two days after the Court sentenced Stamps, OLMS investigators instructed her that she could not use union funds for personal expenses.  King was again not deterred in 2018 when the NLRB ordered her to cease alienating union funds.  King was still undeterred when OLMS investigators confronted her with evidence of her theft in June 2019.  King has made clear that a nine-month prison sentence and several admonishments from law enforcement are not a

sufficient deterrent.  The Court should impose a sentence that is meaningfully greater than Stamps'

9-month sentence.  The United States is recommending a one-year term of imprisonment.

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/ Matthew P. Phelps
Matthew P. Phelps, No. 17933
Assistant U.S. Attorney
U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4800

*Counsel for the United States of America*